UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT (RAFFAUEL) GOOCH,

    Plaintiff,    Case No. 1:14-cv-689

v.    Hon. Robert J. Jonker

ACCREDITED HOME LENDERS,
*et al.*,

    Defendants.
_____/

**REPORT AND RECOMMENDATION**

    This is a an action brought by *pro se* plaintiff Robert (Raffauel) Gooch (sometimes referred to as "Gooch") against Accredited Home Lenders ("AHL"), Mortgage Electronic Registration Systems, Inc. ("MERS"), Ocwen Loan Servicing LLC ("Ocwen"), Saxon Mortgage Services, Inc. ("Saxon"), and unknown parties. Compl. (docket no. 1). This matter is now before the Court on motions to dismiss filed by defendants Ocwen and MERS (docket no. 7) and defendant Saxon (docket no. 25).[1]

    **I.**  **Plaintiff's complaint**

    Plaintiff's complaint sets forth the following allegations. In 1965, plaintiff's father, Robert Gooch, purchased property located at 22 Shelby Street, SW, Grand Rapids, Michigan (the "property"). Compl. at ¶ 6 (docket no. 1). On July 14, 2006, Robert Gooch executed a mortgage on the property in favor of AHL (the "mortgage"), secured by a loan in the principal amount of $72,000.00, with monthly installment payments of $473.35 (the "loan"). *Id.* at ¶¶ 8-9. Plaintiff

---

[1] The Court notes that a default was entered against defendant AHL on September 11, 2014. *See* Entry of Default (docket no. 34).

identified AHL as the mortgage lender and MERS as the mortgagee, "acting as a nominee for lender and lenders [sic] successors and assigns." *Id.* at ¶¶ 3-4. The loan was due no later than August 1, 2036. *Id.* at ¶ 10. Plaintiff obtained title to the property in 2006, subject to this mortgage which plaintiff "agreed to payoff."[2] *Id.* at ¶¶ 7-8. Robert Gooch died in May 2008. *Id.* at ¶ 17.

On May 1, 2009, AHL filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware. *Id.* at ¶ 11. When AHL filed for bankruptcy, plaintiff was offered the opportunity to purchase the house for the sum of $10,000.00, but could not afford to do so at that time. *Id.* at ¶ 13. Plaintiff continued to make the monthly installment payments to AHL during the bankruptcy proceedings. *Id.* at ¶ 14.

Defendant Saxon serviced the loan for an unspecified period of time. *Id.* at ¶ 15. Then, on April 20, 2010, defendant Ocwen "allegedly acquired servicing rights" to the loan and "started charging [plaintiff] for payments [he] had already made to [AHL]." *Id.* Over two years later, on September 25, 2012, Ocwen increased the amount of plaintiff's payments to $859.13. *Id.* at ¶ 16. When plaintiff asked Ocwen for an explanation of the increased monthly payment amount, Ocwen told plaintiff that "[he] didn't have any authority to object to the increase because the loan was made between [AHL] and [his] father." *Id.* Plaintiff apparently objected to this statement because his father had died back in 2008, and plaintiff had been making payments on the loan from his own bank account for over five years prior to Robert Gooch's death. *Id.* at ¶¶ 17-18.[3]

---

[2] It appears that plaintiff obtained title through a quit claim deed, which he refers to in his complaint as a "Quick Claim Deed."

[3] Plaintiff's allegation that he made payments for the mortgage loan for over five years prior to his father's death is contradicted by other allegations, i.e., that plaintiff's father obtained the loan in 2006 and then died in 2008. Plaintiff could not have been paying for the loan for five years prior to his father's death, because the loan was only two years when his father died.

Ocwen was not listed as the "collection agent" for MERS until January 2014. *Id.* at ¶ 20. Plaintiff believed that Ocwen "was located in the country of India" and that for two years "[he] had to speak with someone from India that [he] couldn't even understand because of their 'broken-English,'" and that "it was virtually impossible" for him to listen to them. *Id.* at ¶¶ 21-23. Plaintiff contacted Ocwen in writing and on the telephone without success. *Id.* at ¶ 24. Ocwen would not discuss the matter with him because his name was not on the "paperwork," even though he provided copies of Robert Gooch's last will and testament, death certificate and the quit claim deed *Id.* at ¶¶ 26-27. Plaintiff was told that "'ALL' money decisions are made in the Country of India" and that he needed to communicate with them through a counselor. *Id.* at ¶¶ 25-28. Plaintiff obtained a "HUD-Approved counselor," but Ocwen refused to talk to the counselor because he was not a lawyer and not listed on "the contract." *Id.* at ¶ 29.

At some point in time, plaintiff filed an action in the Kent County Probate Court requesting a court order that he was the lawful owner of the house. *Id.* at ¶ 30. The case did not result in a court order because plaintiff held title through the quit claim deed. *Id.* The probate judge told plaintiff to hire a lawyer. *Id.* It is unclear from the complaint as to whether this state probate action is still pending. Plaintiff alleges that someone at Ocwen told him that "We don't have to follow the laws of the United States because we are in the country of India." *Id.* at ¶ 31. Finally, plaintiff tried "on several occasions" to apply for a HARP loan modification through Ocwen, but was told he did not qualify. *Id.* at ¶ 32.

Plaintiff seeks relief in five counts. In Count 1, plaintiff claims that Ocwen violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 ("FDCPA"). *Id.* at ¶¶ 37-39. While plaintiff purports to seek compensation against all defendants, this claim appears based upon acts

3

committed by Ocwen. *Id.* Specifically, plaintiff alleged: that Ocwen failed to send him a debt validation letter within five days of its initial communication with plaintiff; that Ocwen failed to name the creditor to whom the debt was owed; that Ocwen incorrectly indicated "that disputes of his mortgage debt had to be made to OCWEN in writing"; that Ocwen incorrectly suggested that any disputes regarding the mortgage debt had to be submitted within 30 days "of the letter's date"; that Ocwen acquired servicing rights to the loan and raised the monthly payments without sending plaintiff "a letter of debt validation"; and that when Ocwen acquired servicing rights to the loan it "immediately said [plaintiff] was behind in [his] escrow payments." *Id.* at ¶¶ 37-39.

In Count 2, plaintiff claims that defendants engaged in "unfair, deceptive, and abusive practices" by: "Illegally debiting consumer checking accounts for loans that were void"; "Illegally charging Plaintiff $80.00 to $100.00 per month for a so-called "Property-Review"; and "Illegally increasing Plaintiff's Mortgage payments from $473.34 per month to $859.13 per month, for a mortgage that was made between plaintiff and another mortgage lender." *Id.* at ¶ 40. Plaintiff's Count 2 alleges abusive practices committed by Ocwen and appears to be brought under the FDCPA. *See* 15 U.S.C. § 1692(a) (referencing "the use of abusive, deceptive, and unfair debt collection practices"); *Purnell v. Arrow Financial Services, LLC*, 303 Fed.Appx. 297, 301 (6th Cir. 2008) ("[t]he FDCPA is a broad statute aimed at eliminating the use of abusive, deceptive, and unfair debt collection practices by debt collectors").

In Count 3, plaintiff claims that defendants committed the state law tort of intentional infliction of emotional distress arising from their "extreme and outrageous conduct." *Id.* at ¶¶ 41-43.

In Count 4, plaintiff claims that Ocwen violated the Racketeering Influence and Corrupt Organization Act, 18 U.S.C. § 1961 *et seq.* ("RICO"). Plaintiff's complaint refers to two

other cases involving Ocwen (in his words):

> Further, in another case Sealy Davis v. OCWEN, No. 01-06-00363-CV, a Texas Jury found that "OCWEN" engaged in "a scheme of unfair, unlawful and deceptive business practices in loan servicing. At trial, a former OCWEN employee testified to the Company's unfair practices, including paying incentives to it's loan collector's for moving properties with equity into foreclosure. Evidence also showed that the company engaged in predatory servicing by not informing borrowers of how to make their loan current and failing to give credit for payments when they were made. Another former employee testified that OCWEN has a business practice of lying, losing payments, delaying credit payments or not crediting payments, with the intent to make a homeowner homeless, or forcing the homeowner to live under a bridge or in a cardboard box.

*Id.* at ¶ 45.[4]

Plaintiff also cites "allegations" in a settlement agreement in an unidentified lawsuit which stated as follows:

> 1. Ocwen failed to promptly and accurately apply payments made by borrowers or to maintain accurate account statement. 2. Charged unauthorized fees for default-related services. 3. Gave false or misleading information to borrowers on loans that had been transferred from other services; 4. On transferred loans with in-process trial and permanent modifications, deceptively sought to collect Payments from consumers under the mortgage's original unmodified terms; 5. Failed to provide correct and timely information to borrowers seeking information about loss mitigation services, including loan modifications; 6. Improperly denied loan modification relief to eligible borrowers; 7. Gave false or misleading reasons for loan modification denials; 8. Robo-signed affidavits in foreclosure proceedings; 9. Imposed force-plate insurance when the servicers knew or should have known borrowers had adequate coverage.

*Id.* at ¶ 46. Plaintiff apparently relies on his recitation of facts attributable to the *Sealy* case and the allegations from the unidentified settlement agreement to establish a RICO violation in his case.

In Count 5, plaintiff claims that because his deceased father was a veteran of World

---

[4] The Court has not located the trial case referenced by plaintiff. The Court has located a short memorandum opinion from the Texas Court of Appeals which contains the case number. *See Ocwen Loan Servicing, LLC v. Sealy Davis*, No. 01-06-00363-CV, 2008 WL 1747430 (Tex. App. Houston [1st Dist.] April 17, 2008) (memorandum opinion granting the parties' agreed motion to dismiss the appeal).

War II, defendants are barred from evicting plaintiff under the Servicemembers Civil Relief Act, 50 U.S.C. App. § 501.[5]  *Id.* at ¶ 48.

In the conclusion to his complaint, plaintiff indicates that his claims are against Ocwen (in his words):

> OCWEN LOAN SERVICES, LLC is a Financial "Predatory".  Their goal is to take people's home and sell them to investor's.  I was fortunate enough to avoid losing my home by sacrificing the money I had set-aside for my food, clothing, leisure time activities, other bills, etc until the Government stepped-in and changed the Mortgage lender laws.
>
> OCWEN LOAN SERVICING, LLC took advantage of me while I was in distress by giving me the run-a-round and surprises, which included, failure to apply payments and maintain accurate account statements, charging unauthorized fees for default-related services, giving me misleading information about loan modification, deception, unreasonable delays and expenses, etc.
>
> These "Unfair" business like action were not within the "Affordable Home Modification Programs" and they have caused me high "Blood-Sugar" counts, Loss of Sleep, Stress, Headaces, Weigh loss, etc.
>
> THEREFORE, Plaintiff should be compensated by the Defendant(s) for years of "Systematic and Significant servicing errors."

*Id.* at p. ID #12 (emphasis in original).  Plaintiff seeks statutory damages under FDCPA and other damages in an amount to be determined by the Court.  *See* Compl. at pp. ID## 8-12.

## II.   Legal standard

Defendants seek to dismiss plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  A complaint may be dismissed for failure to state a claim if it fails to give the defendants a fair notice of the claim and the grounds upon which it rests.  *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007).

---

[5] Plaintiff cites this Act as 50 U.S.C. § 501.

> [A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotation marks omitted).

In making this determination, the complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true. *Morgan v. Churchs Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). In addition, "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. National Collegiate Athletic Association*, 528 F.3d 426, 430 (6th Cir. 2008).

Finally, it is well established that *pro se* complaints, like the one filed in this action, are held to "less stringent standards than formal pleadings drafted by lawyers," *Kent v. Johnson*, 821 F.2d 1220, 1223 (6th Cir. 1987) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)), and should be construed liberally, *see Alexander v. Northern Bureau of Prisons*, 419 Fed. Appx. 544, 545 (6th Cir. 2011). However, the liberal construction of *pro se* complaints does not require this Court to conjure up unpled allegations. *McDonald v. Hall*, 610 F.2d 16, 19 (lst Cir. l979).

### III. Discussion

#### A. Counts 1 and 2 (FDCPA claims)

Under the FDCPA, the term "debt collector" does not include a person attempting to

collect "any debt owed or due or asserted to be owed or due another to the extent such activity. . . . concerns a debt which was not in default at the time it was obtained by such person." 15 U.S.C. § 1692a(6)(F)(iii). *See Glazer v. Chase Home Finance LLC*, 704 F.3d 453, 457 (6th Cir. 2013) (a loan servicer who obtained the loan prior to default is not a debt collector under the FDCPA). Based on the sometimes inconsistent allegations made by plaintiff, as well as the total absence of documentation, it is impossible for this Court to determine whether plaintiff can state a claim against Ocwen, MERS or Saxon for violating the FDCPA. In addition, it is not at all clear from the allegations as to the extent of plaintiff's ownership interest in the property or to the extent of plaintiff's liability for the 2006 mortgage loan. The allegations are further muddled by the letter which plaintiff included in his response to Ocwen's motion. The letter from Ocwen, dated October 15, 2013, was addressed to the "Estate of Robert Gooch Jr." and stated that Ocwen recently sent the "Borrower(s)" a Notice of Default "due to your loan becoming past due." *See* Ocwen Letter (Oct. 15, 2013) (docket no. 10-2 at p. ID# 57). The letter, which was not referenced in the complaint, advised the Estate in pertinent part that "*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose.*" *Id.* (emphasis in original). While this letter indicates that Ocwen acted as a debt collector on October 15, 2013, it was neither addressed to plaintiff nor stated that the loan was in default as of either April 20, 2010 or September 25, 2012. This letter suggests that plaintiff does not have a financial relationship with Ocwen and that he lacks standing to bring this lawsuit.

If plaintiff has any claim, it would be for a violation of the FDCPA. However, the Court cannot be placed in the position of attempting to adjudicate the rights of multiple parties to various property and financial interests on an inadequate record. Accordingly, defendants' motions

8

to dismiss should be denied without prejudice as to the alleged FDCPA violations alleged in Counts 1 and 2. In addition, this matter should be set for a status conference to address the filing of an amended complaint, which would include copies of all of the documents referenced in the complaint, e.g., the original mortgage, mortgage loan documents, mortgage assignments, the quitclaim deed to plaintiff, correspondence between the parties, plaintiff's payment record on the mortgage loan and the Kent County Probate Court records.

### B.  Count 3 (Intentional infliction of emotional distress)

In Count 3, plaintiff alleges a claim for intentional infliction of emotional distress. "Under Michigan law, a *prima facie* case for intentional infliction of emotional distress requires the following elements: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress." *Ruffin-Steinback v. dePasse*, 267 F.3d 457, 464 (6th Cir. 2001) (internal quotation marks omitted). As a general rule, "[d]amages for mental (emotional) distress are not normally recoverable in breach of contract actions." *Hajciar v. Crawford and Co.*, 142 Mich.App. 632, 637, 369 N.W.2d 860, 862 (1985), quoting *Kewin v. Massachusetts Mutual Life Ins. Co.*, 409 Mich. 401, 415, 295 N.W.2d 50 (1980).

> [In] the ordinary commercial contract, damages are not recoverable for disappointment, even amounting to alleged anguish, because of breach . . . [T]hese are contracts entered into for the accomplishment of a commercial purpose. Pecuniary interests are paramount. In such cases breach of contract may cause worry and anxiety varying in degree and kind from contract to contract, depending upon the urgencies thereof, the state of mind of the contracting parties, and other elements, but it has long been settled that recovery therefor was not contemplated by the parties as the 'natural and probable' result of the breach. *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145 [1854]; *Clark v. Moore*, 3 Mich. 55 [1853]; *Miholevich v. Mid-West Mutual Auto Insurance Co.*, 261 Mich. 495, 246 N.W. 202, 81 A.L.R. 633 [1933]; *Frederick v. Hillebrand*, 199 Mich. 333, 165 N.W. 810 [1917].

*Stewart v. Rudner*, 349 Mich. 459, 469, 84 N.W.2d 816 (1957). The exceptions to this general rule

involve contracts which are not "purely commercial in their nature," involving "rights we cherish, dignities we respect, emotions recognized by all as both sacred and personal." *Id.* Examples of contracts which were not purely commercial include breach of a promise by a doctor to perform a Caesarean section resulting in a stillborn child, *Stewart*, 349 Mich. 459, and breach of a promise to marry which resulted in injury to the plaintiff's feelings, reputation and "public disgrace," *Vanderpool v. Richardson*, 52 Mich. 336, 17 N.W. 936, 937(1883). *Id.* Here, plaintiff's claim arises from a purely commercial contract involving a mortgage loan. Even if plaintiff had alleged a breach of contract which resulted in him feeling disappointment, anxiety, worry and anguish, plaintiff cannot recover damages under a theory of intentional infliction of emotional distress. *See Stewart*, 349 Mich. at 469; *Davis v. GMAC*, Nos. 307721 and 313846, 2014 WL 2751046 at *4 (Mich. App. June 17, 2014) ( "Michigan courts and federal courts applying Michigan law have repeatedly held that plaintiffs may not claim emotional distress in foreclosure actions"). Accordingly, defendants' motions to dismiss should be granted as to plaintiff's claim for intentional infliction of emotional distress.

      **C.**     **Count 4 (RICO violation)**

In Count 4, plaintiff alleged that Ocwen violated RICO, which provides in pertinent part that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. 18 U.S.C. § 1962©. To state a civil claim under RICO, a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Heinrich v. Waiting Angels*

*Adoption Services, Inc.*, 668 F.3d 393, 404 (6th Cir. 2012); 18 U.S.C. § 1962©.  To satisfy the "pattern of racketeering" element, a plaintiff must plead (and ultimately prove) that "at least two acts of racketeering activity" occurred over a period of years.  18 U.S.C. § 1961(5).  "RICO defines 'racketeering activity' to include violations of various predicate criminal statutes including mail and wire fraud."  *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 20 (2010) (citing 18 U.S.C. § 1961(1)).

To avoid dismissal of a RICO claim, a plaintiff must allege facts to plead sufficiently and plausibly two predicate acts.  *See*, *e.g.*, *Advocacy Organization for Patients and Providers v. Auto Club Insurance Association*, 176 F.3d 315, 325-26 (6th Cir. 1999) (upholding dismissal of RICO claim because complaint did not sufficiently plead mail and/or wire fraud or extortion as predicate acts).  A plaintiff must show not only that the predicate act was a "but for" cause of the plaintiff's injuries, but also that it was a proximate cause.  *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992).  A plaintiff must show "some direct relation between the injury asserted and the injurious conduct alleged."  *Id.*  Finally, under RICO, an "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity," while a "person" is defined as "any individual or entity capable of holding a legal or beneficial interest in property."  18 U.S.C. § 1961(3), (4).

As discussed, plaintiff based his RICO claim on statements attributable to the *Sealy* case and portions of an unidentified settlement agreement, and then states in conclusory fashion that "the actions of defendant(s) stated in paragraphs 1 through 36 constitutes [sic] a 'RACKETEERING INFLUENCE AND CORRUPT ORGANIZATION.' "  Compl. at ¶ 44 (emphasis in original).

Plaintiff's cursory allegations do not identify any "enterprise" involving Ocwen or that such an enterprise engaged in previous acts of racketeering activity. In summary, plaintiff's complaint has failed "to state a claim to relief that is plausible on its face" with respect to the RICO claim. *Iqbal*, 556 U.S. at 678. Accordingly, defendants' motions to dismiss should be granted as to plaintiff's RICO claim alleged in Count 4.

### D.    Count 5 (Servicemembers Civil Relief Act)

In Count 5, plaintiff alleged that defendants could not act against him under the Servicemember Civil Relief Act because his deceased father was a veteran of World War II. One purpose of the Act is "to provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during their military service." 50 U.S.C. App. § 502(2). This count is frivolous. There is no allegation that plaintiff's father was in the "military service" at any time relevant to this action. *See Cronin v. United States*, 765 F.3d 1331, 1334-36 (Fed. Cir. 2014) (discussing "military service" sufficient to toll a statute of limitations under the Act). Furthermore, plaintiff's father had been deceased for about two years when plaintiff's first dispute arose with Ocwen in 2010. Accordingly, defendants' motions to dismiss should be granted as to plaintiff's Count 5.

## IV.    RECOMMENDATION

For these reasons, I recommend that the motions to dismiss filed by defendants Ocwen and MERS (docket no. 7) and by defendant Saxon (docket no. 25) be **DENIED without prejudice** as to Counts 1 and 2 and **GRANTED with prejudice** as to Counts 3, 4 and 5.

I further recommend that this matter be set for a status conference to address the filing of an amended complaint and the status of the respective parties.

Entered: March 31, 2015          /s/ Hugh W. Brenneman, Jr.
                                 Hugh W. Brenneman, Jr.
                                 United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).